IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

CLERK'S OFFICE U.S. DIST COURT
AT ROANOKE, VA
FILED

MAR 16 2007

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

| | | |
|---|---|---|
| CHARLES H. POWERS, trading as<br>SADISCO® OF WYTHEVILLE, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 7:05cv00436 |
| | ) | |
| A. JAMES COBLE, a/k/a JIMMY<br>COBLE and ALLEN J. COBLE a/k/a<br>A.J. COBLE, | ) | |
| | ) | |
| | ) | |
| | ) By: | The Hon. Michael F. Urbanski |
| Defendants. | ) | United States Magistrate Judge |

## MEMORANDUM OPINION

This matter is before the court on cross motions for summary judgment. After substantial briefing and oral argument on March 2, 2007, this matter is ripe for disposition.

Plaintiff Charles H. Powers, t/a SADISCO of Wytheville, ("Powers") brought this action for conversion, breach of fiduciary duty and business conspiracy against A. James Coble ("Jimmy Coble") and his father, A.J. Coble ("A.J. Coble") arising out of the operation of a automobile salvage business in Wytheville.

Since 1984, Jimmy Coble has managed the SADISCO salvage business in Wytheville, Virginia. Powers, headquartered in Florence, South Carolina, owns and operates eighteen salvage auction businesses in southeastern United States. Powers alleges that SADISCO of Wytheville was his sole proprietorship and that the Cobles were his employees. The Cobles assert that the arrangement was a partnership. The Wytheville real estate is owned by Powers and the Cobles as joint tenants, and profits from that business were historically divided 50% to Jimmy Coble, 25% to A.J. Coble, and 25% to Powers. Powers characterizes these payments as

"employment bonuses" from certain "net profits" of SADISCO of Wytheville. In recent years, the relations between Powers and the Cobles soured, ultimately leading to the termination of their business relations and this action.[1]

Powers' legal claims derive from three principal factual allegations. First, Powers contends that the Cobles converted large sums of money. The Cobles respond that the money transferred was a legitimate distribution of the profits of the business and was rightfully theirs. Second, Powers contends that Jimmy Coble terminated SADISCO of Wytheville's contract with its single largest customer, State Farm Insurance Company, in an effort to reduce inventory and maximize cash flow which was then converted by the Cobles. The Cobles respond that reorganization by State Farm caused SADISCO of Wytheville to be overrun with automobiles and that this excessive volume, combined with paperwork delays by State Farm, caused administrative problems requiring the termination of the State Farm contract. Third, Powers asserts that Jimmy Coble engaged in various acts of self-dealing by operating a towing service, Southwest Towing, and by selling abandoned cars and used parts owned by SADISCO of Wytheville as his own and pocketing the proceeds. Jimmy Coble responds that his towing operation did not pose a conflict of interest for SADISCO of Wytheville because his company provided reliable towing services at a competitive rate in areas such as the coal fields and West Virginia where it was difficult to obtain reliable towing contractors. Jimmy Coble also asserts

---

[1] Jimmy Coble testified that he has not spoken to Powers since 2000, following some heated discussions regarding the sale of the business. The Cobles contend that this souring of the business relationship caused them to be apprehensive regarding their interest in the profits requiring them to move monies to separate accounts to which Powers did not have ready access.

2

that he did not sell abandoned cars or used parts off of SADISCO of Wytheville vehicles, and that Powers cannot prove any damages to SADISCO relating to these allegations.

Each side has moved for summary judgment. Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue of a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In making this determination, the court must view the facts and the inferences to be drawn from those facts in the light most favorable to the party opposing the motion. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994), cert. denied, 513 U.S. 813 (1994); Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1129 (4th Cir. 1987); Ross v. Communications Satellite Corp., 759 F.2d 355 (4th Cir. 1985). Nevertheless, where the record taken as a whole cannot lead a rational trier of fact to find for the non-moving party, no genuine issue exists for trial and summary judgment is appropriate. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). For the reasons stated on the record at the March 2, 2007 hearing, summary judgment is not appropriate as to Powers' claims concerning the monetary transfers or the termination of the State Farm contract as genuine issues of material fact exist. Likewise, as to Powers claims that Jimmy Coble breached his fiduciary duties owed to SADISCO of Wytheville through various acts of self-dealing, including running a towing service providing services to SADISCO of Wytheville from SADISCO's premises, disputed issues of material fact preclude entry of summary judgment on these claims as well.

3

# I.

On the issues of the 2001 and 2005 monetary transfers, factual disputes abound. As to all of the monetary transfers, the Cobles assert that the money is rightfully theirs and they only took the 75% of profits to which they were entitled. Powers asserts that the Cobles were his employees and that they had no authority to take these monies. The Cobles assert that they were entitled to these monies as their share of profits, but Powers asserts that these monies are not properly characterized as profits because the Cobles did not pay taxes on them. Issues of fact exist therefore as to the nature of the funds transferred and their ownership. Further, questions of fact exist as to whether the fund transfers were authorized, either through Powers' knowledge and acquiescence of certain of the transfers or because the Cobles were allowed to take distributions of funds at their will due to the way the business historically operated.

Powers first alleges that the Cobles wrongfully converted $350,000 to their own use on November 28, 2001. While $100,000 was quickly returned to the company, the remaining $250,000 was placed in a separate SADISCO of Wytheville account at another bank until 2005. The Cobles assert that the $250,000 was never truly converted, but rather it was placed in a separate SADISCO of Wytheville account for safekeeping because Powers had threatened to clean out the company's bank accounts. The Cobles assert that this money was profit, their share of which was 75%. Powers admits that he knew of the transfer by early 2002, but claims that he did not have access to it and did not even know the bank where it had been deposited. Factual issues exist as regards the Cobles' right to their share of the funds transferred, Powers' knowledge of the transfer, access to these funds, and his four year acquiescence to this transfer.

4

The Cobles assert that in early July 2005, Powers' agents met with them and told them that a new manager would be coming to Wytheville. While the Cobles assert that nothing was decided at this meeting, shortly thereafter, on July 6, 2005, the Cobles wrote themselves checks for 75% of the $250,000 ($187,500), they had squirreled away, and sent the remaining 25% ($62,500) to Powers. Powers contends that Jimmy Coble was terminated as manager on July 5, 2005, and that he and A.J Coble had no authority to write these checks. The Cobles contend the monies are theirs and that the transfers were appropriate. These factual questions likewise preclude summary judgment on this issue.[2]

On May 4, 2005, Jimmy Coble wrote a $50,000 check to A.J. Coble, and on May 31, 2005, A.J. Coble wrote a $112,570.50 check to Jimmy Coble, all from SADISCO of Wytheville funds. Powers asserts that these payments were unauthorized and that the funds dispersed were not true profits but instead were generated by the cash flow spike caused by the termination of the State Farm contract in late 2004. To support this assertion, Powers asserts that the timing of the May 2005 payment was inconsistent with prior practice of paying out profits at year end and that the amount the Cobles paid themselves in May 2005 was roughly equivalent to SADISCO of Wytheville's historic annual profit distribution. The Cobles contend that Powers was overpaid by $50,000 in late 2004, and that Powers had agreed that the Cobles could rectify the overpayment at the time of the next distribution of profits. Factual questions abound.

---

[2]Jimmy Coble wrote three other checks in early July, 2005 from the SADISCO of Wytheville operating account, $31,250 to A.J. Coble, $31,250 to Powers and $50,656.75 to himself, which the Cobles contend represent their respective interests. Powers instructed the bank to stop payment on these checks, and these funds represent a portion of the Cobles' counterclaim.

5

## II.

Likewise, factual issues preclude entry of summary judgment on the claim concerning termination of the State Farm contract. Powers asserts that the termination of the State Farm contract was highly irregular and would have constituted a firing offense had he known about it. Powers claims that the termination of its largest customer was done to sabotage the company. Powers suggests that the termination of State Farm reduced the company's inventory which caused a temporary spike in its cash. Powers suggests that the Cobles' flurry of check writing in May and July 2005 was an effort to capitalize on this short term cash glut. Over the long term, Powers asserts, termination of the largest customer would cause the supply of cars to dry up and would destroy the business. Powers alleges damages in lost profits in 2005 of more than $140,000 from the termination of this contract.

For their sake, the Cobles state that due to a 2004 internal reorganization, State Farm cancelled its contract with the SADISCO operation in Roanoke and transferred all of the Roanoke salvage business to Wytheville. Jimmy Coble testified that the inventory of cars in Wytheville swelled to an unmanageable level and that this volume, combined with delays in State Farm processing the paperwork for these vehicles, created a logistical nightmare. Because of the delays in paperwork, the volume of cars, and the financial strain put on the company, Jimmy Coble terminated the State Farm contract. The Cobles did not notify Powers of the termination.

Given these divergent positions, there is a clear dispute of fact as to whether or not the termination of the State Farm contract represented sabotage and a breach of fiduciary duty, an act in furtherance of the business conspiracy or an integral part of the conversion effort, or rather was

6

done with SADISCO of Wytheville's business interests in mind. Summary judgment is inappropriate as to this claim as well.[3]

<h1 style="text-align:center">III.</h1>

Powers asserts various actions by Jimmy Coble were inconsistent with his obligation as fiduciary and employee, including running an inherently conflicting towing service; personally profiting from the sale of SADISCO's used parts and abandoned cars; and buying and selling cars at company auctions for his own account. Powers asserts that the Cobles were his employees, but the Cobles contend that the SADISCO of Wytheville arrangement was a partnership. See Def.s' Mem. in Opp. to Pl.'s Mot. for Summ. J. (Docket No. 60), at 5 n.7; Def.s' Mem. in Supp. of Mot. for Partial Summ. J. (Docket No. 53), at 6 n.10; 33 n. 21. Under either circumstance, a fiduciary relationship exists. In Virginia, an employee owes a fiduciary duty of loyalty to his employer during his employment, and is "duty bound not to act adversely to the interest of his employer by serving or acquiring any private interest of his own in antagonism or opposition thereto." Horne v. Holley, 167 Va. 234, 241, 188 S.E. 169, 172 (1936); Williams v. Dominion Technology Partners, L.L.C., 265 Va. 280, 289, 576 S.E.2d 752, 757 (2003). Likewise, a partner owes "a high degree of fiduciary duty toward the others arising out of the confidential relationship between them. That includes a duty to each to make full and frank

---

[3]The Cobles argue that the State Farm termination was not pled with specificity and that it ought not be a part of this case. Powers states that the Cobles did not tell Powers of the termination at the time it was done or even after the suit was filed. Powers asserts that the termination was only discovered after this suit was commenced when he was advised by State Farm. The Cobles did not produce the termination letter in discovery. Further, Powers notes that he disclosed the termination in response to an interrogatory answer on December 19, 2005, and that the termination letter was the first document marked as a deposition exhibit in July 2006. Under these circumstances, the Cobles suffer no prejudice by having the termination of the State Farm contract considered by the jury in connection with the claims in this case.

7

disclosure of all facts within his knowledge that may affect the value of the others' interests."

Burruss v. Green Auction & Realty Co., 228 Va. 6, 10-11, 319 S.E.2d 725, 727 (1984).

Powers claims that Jimmy Coble operated Southwest Towing which provided towing services for a fee to SADISCO of Wytheville, yet did not advise Powers of his antagonistic ownership interest. Powers claims that he has been damaged because this business was run out of the SADISCO of Wytheville's operation at its expense. While Powers has not identified any overcharges resulting from this conflict of interest, he testified that Jimmy Powers seemed to be getting the better towing assignments. Other witnesses testified that this arrangement could cause a self-dealing manager to take the more profitable towing assignments for himself. Jimmy Coble claims that Southwest Towing posed no conflict and was, in fact, a benefit to SADISCO of Wytheville because Southwest Towing provided reliable towing services in parts of the area served by the Wytheville operation, particularly the coal fields and West Virginia, where towing contractors were hard to find. Coble also asserts that there is no evidence of any overcharging by Southwest Towing or of any other damages to SADISCO of Wytheville from his operation of the towing service.

Powers asserts other acts of ancillary mischief against Jimmy Coble, including personally profiting by selling parts from salvage cars, selling abandoned cars and buying and selling cars at company auctions for his own account. These claims arise out of admissions by Jimmy Coble to Powers' agent, Aubrey Hammett, in May and July 2005. In deposition, Jimmy Coble testified that he bought and sold somewhere between 10 and 100 cars at auction between 1982 and 2005. He also testified that he never removed a part from a salvage car that belonged to an insurance company, but did purchase junk cars and sell parts off of them from the undeveloped back part of

8

the SADISCO of Wytheville property. Jimmy Coble testified that there were roughly 50-125 cars in that part of the lot at a time. Jimmy Coble also admitted selling some of these cars for scrap, and that all of the monies for selling parts and scrap cars were recorded on the books of Southwest Towing. Jimmy Coble could not recall the total amount of his profit from these activities, but testified to being paid $8,000 at one time for scrap cars which he had accumulated over a two to three year period. Obviously, there are many disputed issues of material fact surrounding Powers' claims of various misdeeds by Jimmy Coble precluding summary judgment on the merits of these claims.

The Cobles suggest that summary judgment is nevertheless appropriate because Powers has adduced no evidence of damages rising to the level of a reasonable certainty required under Virginia law. See Gertler v. Bowling, 202 Va. 213, 215, 116 S.E.2d 268, 270 (1960); Crist v. Metropolitan Mortgage Fund, Inc., 231 Va. 190, 195, 343 S.E.2d 308, 311 (1986). To be sure, Powers' evidence as to damages arising from this conduct is decidedly thin. While the operation of Southwest Towing by Jimmy Coble out of the SADISCO of Wytheville location plainly raises a conflict of interest, Powers can point to no evidence substantiating any losses in terms of overcharges for towing services or otherwise associated with Jimmy Coble's towing business. Evidence of damages flowing from the other claims of self-dealing by Jimmy Coble also falls short of reasonable certainty. No evidence has been cited to the court regarding profits from this activity except for a one time salvage payment of $8,000. Jimmy Coble testified that Southwest

9

Towing advertised for and bought these junk cars and had them stored on an "undeveloped" part of the Wytheville property.[4]

Powers contends that once he establishes self-dealing by a fiduciary, Virginia law places the burden of proving that transactions in which his fiduciary, Jimmy Coble, had a personal interest were not detrimental to him. Under Virginia law, when a fiduciary relationship "is found to exist, any transaction to the benefit of the dominant party and to the detriment of the other is presumptively fraudulent." Nicholson v. Shockey, 192 Va. 270, 278, 64 S.E.2d 813, 817 (1951). In this case, material issues of disputed fact exist as to whether Jimmy Coble, through Southwest Towing and otherwise, was engaged in self-dealing to the detriment of SADISCO of Wytheville. If at trial Powers is able to prove these allegations of self-dealing, the burden shifts to the Cobles to overcome the presumption of fraud "by clear and satisfactory evidence. Such degree of proof means something more than a mere preponderance of the evidence." Nicholson, 192 Va. at 282, 64 S.E. 2d at 820; Abingdon Pediatrics, P.C. v. Carter, 2002 WL 485038 (W.D. Va. March 25, 2002).

The Cobles contend that it is not enough for Powers to demonstrate self-dealing, and that in order for the burden to shift, Powers must also demonstrate that the interested transactions were both (1) beneficial to Jimmy Coble and (2) detrimental to Powers. The Cobles argue that because there is no competent evidence that Jimmy Coble's alleged self-dealing harmed Powers,

---

[4]At the summary judgment hearing, Powers argued that its measure of damages was at least the amount of overhead to run the conflicting towing operation out of the SADISCO of Wytheville operation. While creative, the problem with this argument is that the real estate on which SADISCO of Wytheville was based and Southwest Towing was operating was 75% owned by the Cobles. Indeed, there is no evidence as to whether any SADISCO assets were used, much less to what extent they were used, to run Southwest Towing.

10

Powers is not entitled to the burden shifting presumption. This argument is counterintuitive, as one rationale for shifting the burden of proof of harm from self-dealing by a fiduciary is the fact that the self-dealing fiduciary has a confidential relationship with his principal and, as such, is in control of the evidence of his own actions. In Thomas v. Turner's Adm'r., 187 Va 1, 12 S.E.149 (1890), the Supreme Court relied upon the "great rule of the court that he who bargains in matter of advantage with a person placing confidence in him is bound to show that a reasonable use has been made of that confidence, a rule applying to trustees, attorneys, or any one else." 149 S.E. at 154. Because the fiduciary is in such a position of trust and duty, the burden shifts to him to demonstrate that his actions did not harm his principal. To require Powers to prove damage to SADISCO of Wytheville from Jimmy Coble's self-dealing defeats the purpose of the burden shift.

In addition, the case upon which the Cobles principally rely for this argument, Heckscher v. Blanton, 111 Va. 648, 69 S.E. 1045 (1910), does not support their argument. Heckscher involved a dispute between a syndicate of owners of certain mining property and their trustee, Blanton, who held legal title to the property for himself and the other owners. The owners dispatched Blanton to sell the property, and he retained J.T. Brown & Co. as seller's real estate agent. The court noted that the owners of the property agreed to pay Brown a 10% commission on the sale. 69 S.E. at 1048-49; see also Blanton v. Heckscher, 101 Va. 42, 42 S.E. 915 (1902). After Brown secured an option to purchase the property from a third party for $100,000, Brown and Blanton secretly agreed to split Brown's $10,000 commission. Upon learning of the commission transaction, Heckscher, who owned the largest interest in the property, brought suit for an accounting. The Virginia Supreme Court rejected Heckscher's request, finding that

11

because the owners had agreed to pay Brown a 10% commission, they suffered no detriment from the agreement between Brown and Blanton to divide that amount. The court noted that as the sellers received exactly the proceeds of sale for which they contracted, "less only the commissions they had agreed to pay Brown & Co.," Heckscher, 69 S.E. at 1048-49, they suffered no detriment. In Heckscher, the secret agreement between Blanton and Brown worked no detriment to the landowners as they already agreed to pay a 10% commission. Here, in contrast, Powers never agreed that Jimmy Coble could obtain personal benefit from secret dealings ancillary to his operation of SADISCO of Wytheville. Given Jimmy Coble's fiduciary status, if Powers is able to prove the fact of self-dealing, established Virginia law requires that the Cobles demonstrate that these interested transactions did not harm SADISCO of Wytheville. Given the genuine disputes of material fact inherent in these issues, summary judgment is not proper as to these claims of ancillary misdeeds as well.

## IV.

For these reasons, the motions for summary judgment filed in this case by each side will be denied by separate order.

Enter this _16th_ day of ___March___, 2007.

_____
Michael F. Urbanski
United States Magistrate Judge

12